## FILSAM CORPORATION

v.

### Norman E. DYER.

### Civ. A. No. 75-3636.

United States District Court,
E. D. Pennsylvania.

Nov. 24, 1976.

Alan E. Kear, Philadelphia, Pa., for plaintiff.

Roger F. Cox, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case presents yet another of the myriad situations which test the intended

scope of Pennsylvania's long-arm statute.[1] The underlying lawsuit is an action by a corporate owner of Pennsylvania real estate for alleged breach by a nonresident individual of an agreement to purchase that real estate.[2] The defendant, a Minnesota businessman and real estate investor, aside from attending an Eagles-Giants football game many years ago, has been in Pennsylvania only twice, once to inspect the real estate, which he intended to lease to third parties, and once to attend the (aborted) settlement.

Long-arm jurisdiction is asserted to attach on several theories: (1) that defendant was doing business in Pennsylvania within the meaning of section 8309(a)(2) (doing of a single act with an intention to perform a series of such acts); (2) that defendant was doing business in Pennsylvania within the meaning of section 8309(a)(5) (ownership of real estate in Pennsylvania); and (3) that by refusing to conclude settlement, defendant, under section 8305, caused harm in Pennsylvania while acting outside the state. Plaintiff also advances the interesting proposition that section 8309(c), in specifically providing that foreign corporations which acquire mortgages and real estate for leasing are not "doing business," creates the inference that for those who are not foreign corporations such activity *is* "doing business."

It is defendants' contention that he was not "doing business" under any of the terms of section 8309(a) of the Pennsylvania long-arm statute; that he did not, under section 8305, cause harm within the Commonwealth while acting outside it; and

that, under the due process clause of the Fourteenth Amendment, he is not constitutionally subject to the exercise of *in personam* jurisdiction. In connection with these basic claims, defendant also asserts that, although he is an individual, he is entitled to the benefit of section 8309(c), which provides *inter alia* that as to foreign corporations the acquisition in Pennsylvania of mortgages and real estate for leasing is not "doing business." With respect to this last assertion, defendant submits that he is within the protection of 8309(c) by its own terms;[3] however, if such a construction is not reached, he contends that he is still entitled to the benefit of that section by virtue of the equal protection clause of the Fourteenth Amendment.

The case is before us upon defendant's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), Fed.R.Civ.P. Before considering the merits of defendant's motion, it is, of course, necessary to review in some detail the factual record, which consists of the complaint itself, defendant's affidavit, and a supplementary letter from defendant's counsel. We turn now to this task, to be followed by a discussion of the applicable law. As will in due course appear, we are of the opinion that the exercise of personal jurisdiction under section 8309(a)(2) and (a)(5) is appropriate and does not offend the due process clause of the fourteenth amendment. Nor do we find any other obstacles to the use of those subsections. As will also appear, owing to the less than translucent nature of Pennsylvania's long-arm statute, some of the issues presented in this case are close and troublesome, hence the length of this opinion.

---

1. *Pa.Stat.Ann.* tit. 42, § 8301 *et seq.* (Supp. 1976–77). Our jurisdiction in this matter is based on diversity of citizenship. 28 U.S.C. § 1332 (1970). In accordance with rule 4(d)(7), Fed.R.Civ.P., our attention is directed to the long-arm statute of the forum state, Pennsylvania. In applying that statute to the novel facts of the instant case, we must of course undertake to determine what the Pennsylvania Supreme Court would hold if this case were before it.

2. Plaintiff Filsam Corporation is incorporated under the laws of Pennsylvania and has its principal place of business in New York.

3. Defendant argues that § 8309(c) was only made necessary by 8309(b) which, as to foreign corporations only, extends the long-arm statute's reach to the limit of due process. Defendant maintains that such activity as is involved here cannot constitutionally provide the basis for personal jurisdiction over individuals and that therefore there was no need for the legislature to be more specific in subsection (c).

## II. The Facts of Record

In the fall of 1974, defendant Norman E. Dyer (Dyer), a resident of Minnesota, became interested in purchasing real estate in Philadelphia, Pennsylvania, for investment purposes. Dyer had had dealings with Midas International, Inc. (Midas), through its Chicago base of operations, and had discussed with Midas an arrangement by which Dyer would acquire premises suitable to Midas and then lease those premises to Midas for a period of years. Midas was particularly interested in a building owned by plaintiff Filsam Corporation (Filsam), which it called to Dyer's attention.[4] Dyer thereupon contacted Filsam, proposed purchase of the property, and entered into negotiations with Filsam's Pennsylvania agent.

On October 3, 1974, Dyer made a written offer to purchase the property for $575,000, a price which was subsequently rejected. By October 29, Dyer and Midas had reached agreement on the basic terms of their lease. Dyer then telephoned an offer of $650,000 for the purchase of the Filsam property. Early in December, Dyer made his first entry into Pennsylvania in connection with the proposed real estate transaction. Accompanied by agents of Midas and Filsam, he viewed the property under discussion. Thereafter, Dyer converted his telephoned offer into a written one, and mailed it from Minnesota to Philadelphia where it was accepted by Filsam. One subsequent amendment pertaining to second mortgage financing through Filsam was signed by Filsam in Philadelphia and forwarded to Dyer in Minnesota for his signature. During the interim period Dyer negotiated with Pennsylvania lending institutions for at least some of the necessary financing.

On April 15, 1975, Dyer again visited Pennsylvania in order to attend settlement. He refused to complete that settlement, however, asserting that Filsam had not made repairs to the property as required by the agreement of sale. Before returning to Minnesota, Dyer agreed to extend the settlement by ten days. On the day before that revised settlement date, a representative of Midas informed Dyer that Filsam had still failed to make the requisite repairs. Dyer thereupon refused to complete the transaction and this suit for breach of an agreement to purchase real estate followed. As noted in our preliminary statement, these were the only two times of significance that Dyer was ever in Pennsylvania.

In addition to the above-described congeries of events, two other circumstances are pertinent to the jurisdictional issue before us. First, the lease agreement with Midas did not include all of the building to be purchased by Dyer. Indeed, only 50,000 square feet out of 110,000 square feet were leased to Midas. As stated in a letter from Dyer's counsel, Dyer would have attempted to lease the remaining space. Second, Dyer intended to maintain his ownership of the property as a continuous investment, although he did not expect to manage the property personally.[5] And while he made some attempt to form a corporation for this purpose, he acted as an individual throughout the dealings involved herein.

## III. Discussion

Pennsylvania's long-arm statute offers a panoply of devices by which the assertion of *in personam* jurisdiction over a nonresident individual may be accomplished. We will consider separately those sections which have been fairly presented to us as a basis

---

4. The property is located at 2200 Adams Avenue, Philadelphia.

5. Of course, Dyer or his agent would have had to engage in some management functions with respect to the property as well. The Midas-Dyer Lease agreement provides at paragraph 9:

Landlord agrees to keep in good repair the roof, foundations and exterior walls of the building on the premises and underground

utility and sewer pipes outside of the exterior walls of said building . . . . Tenant shall promptly report in writing to Landlord any defective condition known to it which Landlord is required to repair, and failure to so report such defects shall make Tenant responsible to Landlord by reason of such defects.

for jurisdiction, along with the related constitutional attacks.

## A. Doing Business: Section 8309(a)(2) ("Single Act . . . Series of Such Acts")

Doing business in Pennsylvania by nonresident individuals is made the basis for personal jurisdiction by section 8304 of the Pennsylvania statute. Of more direct concern for present purposes, however, is section 8309(a) which attempts to define the term "doing business":

(a) *General rule.*—Any of the following shall constitute "doing business" for the purposes of this chapter:

(1) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.

(2) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.

(3) The shipping of merchandise directly or indirectly into or through this Commonwealth.

(4) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by the Commonwealth or any of its agencies.

(5) The ownership, use or possession of any real property situate within this Commonwealth.

One of the provisions of subsection *a* here at issue is *(a)(2)*, requiring the occurrence of only a single act in Pennsylvania if that act is performed with an intent to initiate a series of such acts. Because of the apparent breadth of its scope, 8309(a)(2) will be the first focus of our "doing business" discussion.

The problem encountered in applying 8309(a)(2) in this case is to identify first a "single act" and then the "series of such acts" intended to be initiated. Dyer engaged in activity in Pennsylvania giving rise both to an agreement to purchase real estate and an agreement to lease away part of that real estate—with an intention to lease away the remainder. Yet defendant contends that we must find an intent to engage in a series of real estate purchases in order to satisfy 8309(a)(2). We do not believe that the framers of the Pennsylvania long-arm statute intended that the "fit" be so tight, *i. e.,* that the "series of such acts" track the "single act" with absolute precision.

We are of the opinion, in light of defendant's overall project, that the agreement to purchase the Filsam property satisfies the single act requirement of section 8309(a)(2). (Put differently, the congeries of acts leading to the purchase agreement is sufficient as a "single act.") The jurisdictional ring is closed, as it were, by our further conclusion that the actual and contemplated leases of portions of that property constitute the necessary "series of such acts." These leases are similar to the initial purchase agreement, but are discrete elements of a multifaceted investment plan.[6] We believe that this approach prudently permits some flexibility in interpreting the "series of such acts" language of 8309(a)(2) by focusing primarily upon the substantiality of ongoing and interrelated business contacts rather than upon exact geometrical comparisons which we believe the Pennsylvania legislature never intended to be made.

---

6. *See Columbia Metal Culvert Co. v. Kaiser Industries Corp.,* 526 F.2d 724 (3d Cir. 1975). In *Columbia Metal* the solicitation of business by a distributor (an individual) plus a single sale pursuant to his distribution contract satisfied the requirements of *(a)(2)*. The court observed:

The Petroni transaction [the sale] meets the requirement of section 8309(a)(2) that a series of similar acts be contemplated because Kennedy [the defendant] had undertaken an obligation under his distributorship contract to solicit business and promote sales of Kaiser products in Pennsylvania.

*Id.* at 728.

As indicated in the text above, we think that Dyer's intention to initiate a series of leases, having entered into a purchase agreement, similarly meets the requirements of 8309*(a)(2)*.

We do not gainsay that the acts giving rise to the agreement to purchase the Filsam property would, if viewed alone, constitute an "integrated transaction" insufficient to effect personal jurisdiction where the defendant is a nonresident individual. *See Rosen v. Solomon*, 374 F.Supp. 915, 918 (E.D.Pa.1974), aff'd, 523 F.2d 1051 (3d Cir. 1975). But Dyer's activity was never intended to be and was in fact not limited merely to the purchase of property. His plan contemplated additional steps toward consummating a continuing business investment through his commercial leasing activity. Indeed, as has been noted, one lease was arranged pursuant to his plan. This case is, therefore, unlike *Rosen* and *Stepnowski v. Avery*, 234 Pa.Super. 492, 340 A.2d 465 (1975), both of which rejected 8309(a)(2) jurisdiction based upon only a single transaction. *Rosen* involved a single stock option agreement by a nonresident individual,[7] and *Stepnowski* arose from a sale of a residence in Pennsylvania by individuals who thereafter left the state. Both cases may be fairly described as involving an "occasional" transaction creating no lasting relationship between the defendant and Pennsylvania. However, we believe that the intent of the legislature in providing a local forum for plaintiffs would be defeated if we were now to extend the concept of "integrated transaction" enunciated in *Rosen* so far that an array of acts creating a systematic business involvement in Pennsylvania is to be viewed as a single act.[8]

It should also be noted that the pertinent language of section 8309(a)(2) was extracted without substantive change from previous versions of the long-arm statute which were interpreted by the Pennsylvania Supreme Court to require a "systematic course of conduct as contrasted with isolated or sporadic occurrences." *Myers v. Mooney*

*Aircraft, Inc.*, 429 Pa. 177, 185, 240 A.2d 505, 510 (1967); accord, *Gorso v. Bell Equipment Co.*, 476 F.2d 1216, 1221 (3d Cir. 1973); *Rosen v. Solomon, supra* at 918. This description of the meaning of 8309(a)(2) reaffirms our position that the investment scheme of defendant Dyer is an adequate basis for the exercise of personal jurisdiction.

We thus conclude that the "doing business" standard of section 8309(a)(2), by operation of section 8304, supports personal jurisdiction over defendant Dyer as one who, for investment, performed an act or acts in this state with an intent to initiate a series of such acts.

### B. *Doing Business: Section 8309(a)(5)*

Section 8309(a)(5) provides that "the ownership, use or possession of any real property situate within this Commonwealth" shall constitute "doing business" for purposes of section 8304. In this case, Dyer became equitable owner of the Pennsylvania property under operation of Pennsylvania law as a result of his agreement to purchase that property. As stated by the Pennsylvania Supreme Court in *Payne v. Clark*, 409 Pa. 557, 561, 187 A.2d 769, 770 (1963):

> From the moment an agreement of sale of real estate is executed and delivered it vests in the grantee what is known as an equitable title to the real estate. (Citation omitted.) Thereupon the vendor is considered as a trustee of the real estate for the purchaser and the latter becomes a trustee of the balance of the purchase money for the seller.

*Accord, Vogel v. Northern Assurance Co.*, 219 F.2d 409 (3d Cir. 1955). "The seller's 'title' which he retains until final conveyance is but a 'security title' and the risk of loss or advantage of gain is borne by the

---

7. In *Rosen* personal jurisdiction was founded upon § 8305 although the court found § 8309(a)(2) to be inapplicable.

8. In this case plaintiff is a corporation incorporated in Pennsylvania and having its principal place of business in New York. Defendant, on the other hand, is an individual and a citizen of Minnesota. Although Pennsylvania's interest

in providing a local forum in this case may seem less compelling than in a case involving a truly resident individual plaintiff and a foreign corporation defendant, that interest is nevertheless to be respected. *Cf. Columbia Metal Culvert Co. v. Kaiser Industries Corp.*, 526 F.2d 724, 730 (3d Cir. 1975).

buyer." *Id.* at 411. The question before us under subsection *(a)(5)* is whether the principle of equitable ownership just described may in this case satisfy the jurisdictional ownership requirement.

By using the language "ownership, use, *or* possession" (emphasis supplied), we believe the Pennsylvania legislature left open the possibility that the "ownership" criterion may be satisfied even in the absence of "use" or "possession." [9] Equitable ownership therefore is certainly not excluded.[10] We believe further that the legislature correctly perceived a general correlation between ownership of real estate in this Commonwealth and business activity here.

In the case before us, Dyer's equitable ownership of Pennsylvania property represents a substantial business involvement, and thus the application of the principle of equitable ownership to 8309(a)(5) would certainly not be a merely nominal extension.

Rather, it would reflect the substance of defendants' rights and obligations under Pennsylvania law in Pennsylvania realty and thus provide some measure of the extent of his activity in this state.[11] Therefore, without deciding whether a correlation between equitable ownership and business activity in Pennsylvania can or must actually be shown in every case, we find it appropriate to apply *(a)(5)* to this contract action arising from a dispute about the realty itself.[12]

We must, however, make one further observation. It has been said that equitable conversion will come about only where the contract for the sale of land is "unconditional . . . such as equity will specifically enforce . . . ." *Bauer v. Hill*, 267 Pa. 559, 562, 110 A. 346, 347 (1920). The defendant argues that his contract to purchase land was conditional upon the making of certain repairs and alterations by Filsam, work which Dyer claims was never done.[13]

**9.** That the normal meaning of "or," as here, is disjunctive is confirmed by the Pennsylvania Supreme Court's discussion in *Commonwealth ex rel. Specter v. Vignola*, 446 Pa. 1, 5, 285 A.2d 869, 871 (1972).

**10.** *See* 73 C.J.S. *Property* § 13, at 185 (1951): "Included, too, within the scope of the term [owner] is any person who has an equitable right to, or interest in, land . . . ."

**11.** The recent decision of the Pennsylvania Supreme Court in *In re Estate of Highberger,* Pa., 360 A.2d 580 (1976), to the effect that the doctrine of equitable conversion will not serve to change a vendor's liability for state inheritance tax purposes, does not intimate that the principle of equitable ownership is in any way diminished as a "theory of real property." *See id.,* at 581. Unlike the provisions of the inheritance tax law, § 8309(a)(5) does, we think, refer to "ownership" in the more general terms of real property law and should not therefore exclude the theory of equitable ownership.

**12.** *See Bork v. Mills,* 458 Pa. 228, 329 A.2d 247 (1974); *cf. DeLeo v. Childs,* 304 F.Supp. 593 (D.Mass.1969) (analogous Massachusetts real estate long-arm provision). *See generally Rivera v. Pocahontas Steamship Co.,* 340 F.Supp. 1307 (D.Mass.1971).

We do not suggest that in every instance equitable ownership will satisfy either statutory or constitutional due process limitations. Indeed, serious questions may be raised under the statute whenever the nonresident defendant is not a corporation and the equitably owned real estate is not to be income-producing in some significant and continuous way.

**13.** Rider to January 5 Agreement of Sale, ¶¶ 26, 27, Plaintiff's Exhibit D. Although another paragraph makes the agreement subject to the lease to Midas and the acquisition of acceptable financing, no one has suggested that these incidents were not fully satisfied.

We underscore that we are not addressing the question whether paragraphs 26 and 27 are in fact conditions as defendant says they are. We will assume that they are conditions merely for purposes of the motion before us, since the result would be the same even if they were not true conditions.

The pertinent paragraphs are as follows:

26. Seller agrees to place the roof in water tight condition and the heating system in good working condition. As soon as this is accomplished, Seller shall notify Buyer of same by registered mail. Buyer shall then have thirty (30) days from the date thereof in which to determine to his own satisfaction that the repairs have been completed.

If Buyer determines that they have not been completed, then Buyer may notify Seller of same by registered mail within the said thirty day period in which case this agreement shall be null and void, all deposit monies shall be returned to Buyer and all copies of this agreement destroyed. In the absence of such notice it shall be assumed the the [sic] contingency has been satisfied or Buyer intends to complete settlement without said approval.

However, it is our view that the existence of such conditions as are within the control of the parties to a contract cannot in itself render the doctrine of equitable conversion inapplicable.

■ The requirement that the land sale contract be "unconditional" should only bar equitable conversion where the condition must be accomplished before the contract can become operative. *See* 3 American Law of Property § 11.24 (1952). In the case of *In re Governor Mifflin Joint School Authority*, 401 Pa. 387, 164 A.2d 221 (1960), for instance, equitable conversion was said not to have taken place where the land purchase agreement was conditioned upon the passage of certain zoning changes. The purchaser in *Governor Mifflin* argued that as equitable owner he should benefit from a condemnation of the property *prior* to the accomplishment of the zoning changes. The Pennsylvania Supreme Court disagreed. It seems clear to us from the Court's discussion that the impediment to equitable conversion was the possibility that no zoning change at all would come about, coupled with the realization that (even if a court of equity were to assume that what the parties agreed to do would be done) the hoped-for zoning change was not within the control of the parties.

In the present case we find no condition which is beyond the control of the parties and we therefore believe that an operative contractual relation arose upon execution of the agreement for the sale of land. Dyer's equitable ownership thus accrued at that time. We also note that no one has raised, and we are unable to find, any condition precedent to the duty of Filsam which from the start might have precluded specific enforcement in favor of Dyer and hence have prevented Dyer's equitable ownership from arising. *See* Restatement of Contracts § 374(1)(1932).

Having determined that Dyer's equitable ownership came about, we are furthermore unwilling to require a showing that the agreed-to repairs were actually performed before *in personam* jurisdiction may be founded upon 8309*(a)(5)*. Although the nonoccurrence of a true condition will excuse performance and indeed terminate equitable ownership, Dyer was the equitable owner of the Pennsylvania property at least until the moment that he acquired his asserted right to avoid the contract. It is at that same moment that Filsam believes it acquired its asserted grounds for suit. Regardless of who will ultimately prevail when the merits of this case are finally addressed, we are satisfied that Dyer's equitable ownership meets the requirements of sections 8304 and 8309(a)(5).

C. *Causing Harm: Section 8305*

■ Plaintiff has also asserted that the alleged breach of contract caused by defendants' failure to perform its purchase obligations satisfied the terms of section 8305, which provides as follows:

§ 8305. *Causing harm by individuals*

Any nonresident of this Commonwealth who, acting outside of this Commonwealth, individually, under or through a fictitious business name, or through an agent, servant or employee, shall have caused any harm within this Commonwealth on or after August 30, 1970, shall be subject to service of process in any civil action or proceeding instituted in the courts of this Commonwealth arising out of or by reason of any such conduct. Service of process in any such civil action or proceeding shall be effected through the Department of State as provided in this chapter.

We believe, however, that plaintiff's reliance on 8305 is foreclosed by the recent Third Circuit decision in *Witt v. Scully*, 539 F.2d 950 (3d Cir. 1976) (Garth, J., dissenting), which held in rather plain terms that a

27. Seller agrees to make the following alterations and repairs prior to settlement:
(a) Restore the floor to its condition prior to the installation of certain equipment (condition of a normal warehouse floor)
(b) Replace all broken windows on the premises
(c) Broom clean the premises.

corporate director's nonperformance in another state was not a result of his "*acting* outside of this Commonwealth." According to *Witt*, nonperformance is simply not action. Although in the present case the factual situation is distinguishable in that Dyer is not in the position of a corporate director, the underlying principle, once established, must have the same effect here as it did in *Witt*.

### D. The Equal Protection Question: Section 8309(c)

■ It is Dyer's contention that regardless of the terms of section 8309(a) he did not do business in Pennsylvania by virtue of section 8309(c).[14] That section states that the acquisition by foreign corporations of mortgage and real estate in Pennsylvania, along with subsequent leasing or conveying, is not "doing business." Although Dyer acknowledges that he is not a corporation, he does maintain that the exemption should be applied to him as a nonresident individual either by a broad interpretation of the statute itself or through operation of the equal protection clause of the fourteenth amendment.

Dyer's statutory position is that the express reference to "foreign corporation" in section 8309(c) does not mean that the legislature intended that individuals in the same circumstances as corporations should be vulnerable to personal jurisdiction; rather, it means only that the legislature considered the exercise of jurisdiction over individuals for the activities described in (c) to be unconstitutional and hence neglected to mention a specific exemption. We must reject this argument. We feel constrained to follow the plain terms of Pennsylvania long-arm statute wherever possible.[15]

Defendant Dyer buttresses his assault on the "foreign corporation" exemption by his claim that the distinction between foreign corporations and unincorporated investors is without a rational basis. That conclusion is unacceptable in view of the limited scrutiny which must be given equal protection attacks upon economic classifications. It has long been held that state legislatures have a wide range in which to exercise their judgment on economic matters. In the seminal case of *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), the Court stated:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation omitted.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one

14. Section 8309(c) provides as follows:
    (c) *Exception.*—Notwithstanding any other provision of this section, for the purposes of determining jurisdiction of courts within this Commonwealth, inspecting, appraising and acquiring real estate and mortgages, and other liens thereon, and personal property and security interest therein, and holding, leasing away, conveying and transferring the same, as fiduciary or otherwise, or collecting debts and enforcing mortgages and rights in property securing the same by any foreign corporation shall not constitute "doing business."

15. The exemption from "doing business" jurisdiction provided in § 8309(c) was granted to a Massachusetts Business Trust in *Penn-Virginia Development Corporation v. Diversified Mortgage Investors*, 395 F.Supp. 195 (W.D.Pa.1975), without discussion of its "foreign corporation" status. Without doting on purely nominal differences, we point out that the foreign corpora-

tion criterion appears to require a definition under Pennsylvania law rather than under the foreign state's law. We need not press that issue here, however, as it would be an obvious perversion of statutory language to find that a nonresident individual defendant is really the same as a foreign corporation. Because § 8309(c), as a statute decreasing jurisdiction, must be strictly construed (*Pa.Stat.Ann.* tit. 1, § 1928(b)(7) (Supp.1976–77)), we cannot find otherwise than that subsection (*c*) is unavailable to defendant.

We also reject plaintiff's argument that one may infer that the legislature meant to say that an *individual* involved in the activities described in § 8309(c) is necessarily "doing business." In our view, a decision that an individual is subject to doing business jurisdiction must be left to an independent consideration of the requirements of § 8309(a).

field and apply a remedy there, neglecting the others.

It is our judgment that the Court has not retreated from that broad language. *See City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

In creating an exception for foreign corporations under 8309(c), the Pennsylvania legislature sought to encourage capital investment in Pennsylvania. *See Trachtman v. T.M.S. Realty and Financial Services*, 393 F.Supp. 1342 (E.D.Pa.1975). The legislative judgment that foreign corporations may provide a greater measure of investment than would individual investors has a sufficiently rational basis to justify the decision not to extend the exception eliminating personal jurisdiction to individual investors. Conversely, the legislature could have concluded that foreign corporate investment, aside from being probably more substantial than individual investment, was more likely to be lost by the failure to create an exemption in 8309(c). We feel that nothing more need be shown in order to sustain this legislative classification. We must, therefore, reject defendant's equal protection claim.[16]

### E. *The Due Process Argument*

■ In analyzing the due process issue in this case we refer to the familiar trilogy consisting of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Those cases have provided substantial room for the development of long-arm statutes and pose no bar to the exercise of jurisdiction in this instance.

*International Shoe* established a due process test based upon certain "minimum contacts" in accord with " 'traditional notions of fair play and substantial justice.' "[17] Under this test the Court upheld the exercise of *in personam* jurisdiction by the state of Washington over International Shoe Company because of the solicitation activities of their salesmen located in Washington. In *McGee*, the Court went much further, upholding the use of a California long-arm statute where defendant's only contacts with California were the mailing of an offer of reinsurance to plaintiff and the acceptance of premiums mailed from California. Lest it appear that the Court had no limitations in mind, *Hanson v. Denckla* halted the pattern of expansion, holding that personal jurisdiction over a trustee could not be maintained where the plaintiff-settlor who at first resided in Pennsylvania removed to Florida and there received the benefits of the income from a Delaware trust. The Court stated that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum *state*, thus in-

---

**16.** The recent Supreme Court decision in *American Motorists Insurance Co. v. Starnes*, 425 U.S. 637, 96 S.Ct. 1800, 48 L.Ed.2d 263 (1976), does not change the foregoing analysis. That case involved a Texas statute requiring a plaintiff to prove that he has a cause of action before a defendant corporation domiciled in Texas can be bound to venue outside the county of its domicile. At the same time the statute provides that a defendant *foreign* corporation may be venue-bound merely upon a plaintiff's showing that such defendant maintains an agent in that county. Defendant in *Starnes* complained that as a foreign corporation it was, under these circumstances, denied the opportunity afforded to domestic corporations to review plaintiff's case preliminary to trial on the merits. A majority of the Court rejected this characterization, observing that in practice *prima facie* proof suffices to bind domestic corporations to venue, and that other pretrial discovery mechanisms are available to foreign corporate defendants so as to equalize the effects. *Id.*, 425 U.S. at 643–644, 96 S.Ct. at 1804.

It would appear to be defendant's reasoning that we are to give the present classification greater scrutiny because the Court in *Starnes* took great analytical pains to avoid deciding whether the classification in that case was rational. We disagree with defendant's reasoning. Furthermore, the situation in *Starnes* suggested on its face that a measure of economic protectionism might have been at work, whereas in the present case the distinction defendant attacks is one between nonresident corporations and nonresident individuals.

**17.** 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

voking the benefits and protections of its laws." *Id.* at 253, 78 S.Ct. at 1240.

Cognizant that we have before us a defendant who is a nonresident individual rather than a foreign corporation, we are nonetheless satisfied that the exercise of personal jurisdiction in this case fully meets the requirements of due process. *See Columbia Metal Culvert Co. v. Kaiser Industries Corp.*, 526 F.2d 724, 730 (3d Cir. 1975). It cannot reasonably be denied that Dyer purposefully availed himself of the privilege of conducting business activity in Pennsylvania; nor can it be denied that defendant had ample contacts with this state pursuant to his long-term investment plan. Furthermore, we see no difficulty in holding that the exercise of personal jurisdiction in this case comports with standards of fair play in view of the close relation between Dyer's contacts and the very basis for this law suit.

Thus, having considered defendant Dyer's numerous statutory and constitutional arguments, we hereby deny his motion to dismiss and order him to file an answer within twenty days.