J-A19039-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BINSWANGER OF PENNSYLVANIA, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| TSG REAL ESTATE LLC, | |
| Appellee | No. 2372 EDA 2015 |

Appeal from the Order Entered June 11, 2015
in the Court of Common Pleas of Philadelphia County Civil Division
at No(s): No. 000901 - February Term, 2014

| | |
|---|---|
| BINSWANGER OF PENNSYLVANIA, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TSG REAL ESTATE LLC, | |
| Appellant | |
| | No. 2524 EDA 2015 |

Appeal from the Order Entered June 11, 2015
in the Court of Common Pleas of Philadelphia County Civil Division
at No(s): February Term, 2014, No. 00901

BEFORE: FORD ELLIOTT, P.J.E., OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:            **FILED DECEMBER 26, 2017**

Binswanger of Pennsylvania, Inc. ("Binswanger") and TSG Real Estate

---

[*] Former Justice specially assigned to the Superior Court.

LLC ("TSG") cross-appeal from the order granting in part and denying in part Binswanger's and TSG's cross-motions for summary judgment and awarding Binswanger $56,666.67 as a commission on TSG's sale of real property. We affirm.

TSG, a real estate company, owned a commercial real property at 1400 Welsh Road, North Wales, Pennsylvania ("the Property"). R.R. at 577a, 623-24a.[1] TSG initially hired Hart Corporation ("Hart") to market the Property, and Hart procured several prospective purchasers. In particular, on September 18, 2013, TWA Holdings, LLC ("TWA") made a written offer to purchase the Property for $3,700,000.00. *Id.* at 583a, 625a, 674a-75a, 720-22a.

On September 20, 2013, dissatisfied with poor "foot traffic" during Hart's tenure as broker, TSG began negotiating an agreement with another broker, Binswanger, to market the property. *Id.* at 640a. TSG insisted that the agreement with Binswanger exclude prospective purchasers who had already made offers on the Property, such as TWA.

On September 27, 2013, Binswanger and TSG entered into a brokerage agreement, which contained the following relevant provisions:

> This Exclusive Right to Sell or Lease Agreement is made as of this 27th September, 2013 . . . by and between [Binswanger] and [TSG].
>
> Except with respect to any transaction, sale, or exchange involving the Excluded Entities, [Binswanger] is hereby

---

[1] For the convenience of the parties, we cite to the reproduced record.

given the sole and exclusive right to list and offer for sale and lease for [TSG's] account [the Property], provided that [Binswanger] agrees by listing and otherwise, to use its best efforts to sell and lease the Property until this Agreement is terminated as herein provided.

EXCEPT WITH RESPECT TO THE EXCLUDED ENTITIES, IF THE PROPERTY, OR ANY PART THEREOF, IS SOLD OR LEASED, OR IF A PURCHASER OR TENANT IS WILLING TO BUY OR LEASE ON TERMS SATISFACTORY TO [TSG] IS PROCURED PRIOR THE TERMINATION OF THIS AGREEMENT (OR AFTER SUCH TERMINATION AS HEREINAFTER SET FORTH), NO MATTER BY WHOMSOEVER THE PROPERTY MAY, BE SOLD, TRANSFERRED, CONVEYED, EXCHANGED OR LEASED OR SUCH PURCHASER OR TENANT PROCURED, WHETHER BY [BINSWANGER] OR BY [TSG]  DIRECTLY OR BY ANY OTHER ENTITY WHATSOEVER, THEN, IN ANY SUCH EVENT, OWNER AGREES THAT [BINSWANGER] SHALL HAVE EARNED A COMMISSION AND [TSG] AGREES TO PAY TO AGENT A SALE OR LEASE COMMISSION AS FOLLOWS:

SALE-FIVE PERCENT (5%) OF THE GROSS AGGREGATE PURCHASE PRICE;

***

All commissions under this Agreement shall be considered earned and shall be due and payable at the time scheduled for closing on a sale.  Upon closing of any transfer or sale of the Property, the party responsible for closing is hereby authorized and directed by [TSG] and [Binswanger] to deduct the commission due from the proceeds of sale or transfer and pay same to [Binswanger]. . . . In the event a purchaser . . . is procured by another broker other than [Binswanger], [Binswanger] agrees to split any sale or lease commission with the other broker.

Notwithstanding anything in this Agreement to the contrary, a commission shall not be earned by, or be payable to, [Binswanger] in connection with:

***

> . . . sales, exchanges, or other transfers to Ancillare, Inc., [TWA], Jerry McBride, or any other entity owned by, controlled by, or associated with any of the foregoing (the "Excluded Entities"), to the extent that such sale, exchange or transfer is completed on or before January 5, 2014 [("the Carve Out Period")[2]]
>
> ***
>
> This Agreement shall be for a term of one (1) year, beginning from the date set forth above; provided, however, that [TSG] shall have the right to cancel this Agreement after six (6) months with thirty (30) days prior written notice to [Binswanger]. After termination of [Binswanger's] exclusive right, [Binswanger] authority shall continue as to those entities with whom [Binswanger] has communicated the offering of the Property for sale or lease so that if, within sixty (60) days of the termination of this Agreement, the Property is sold or leased to any such entity . . . whether by [Binswanger] or by [TSG] directly or by any other agent, or person whomsoever, a full commission as herein prescribed shall be paid to [Binswanger].

R.R. 30a-31a.

On January 3, 2014, two days before the expiration of the Carve Out Period, TSG entered into an agreement to sell the Property to TWA for $3,400,000.00 (the "Agreement of Sale"). *Id.* at 130a-44a. Section III of the Agreement of Sale required TWA to deliver to an escrow agent a deposit ("Deposit") of $50,000.00 upon execution of the agreement. An additional deposit of $150,000.00 was "required at the expiration of the Due Diligence

---

[2] The parties referred to the time period on or before January 5, 2014 as the "carve out period," and we refer to it as the same.

period (hereafter defined) (the "Additional Deposit)." *Id.* at 130. Section VII

of the Agreement of Sale provided, in part:

> 7.1 <u>Buyer's Default.</u> In the event that [TWA] shall fail to fulfill and perform any of the terms and conditions of this Agreement, [TSG] shall be entitled to retain the Deposit and Additional Deposit (if applicable) . . . and this Agreement shall thereafter be null and void.

*Id.* at 135

Section IX of the Agreement of Sale set forth two conditions precedents

to settlement.

> The obligations of [TWA] and Seller pursuant to the Agreement are, at the election of the appropriate respective party, subject to the conditions that:
>
> 9.1 <u>Mortgage Contingency.</u> On or before expiration of the Due Diligence Period, [TWA] shall obtain a mortgage commitment . . . of no less than Two Million Dollars ($2,000,000.00), based on the sole collateral of [the] Property. Failure of [TWA] to obtain financing as provided in this Section 9.1 shall not constitute a default hereof except where such failure is caused by [TWA] failure to seek financing in good faith and on a timely basis. In the event that [TWA] is unable to obtain financing where such inability is not caused by [TWA]'s failure to seek financing in good faith and on a timely basis, the Deposit and Additional Deposit (if applicable) shall be returned to [TWA] with interest earned.
>
> ***
>
> 9.2 <u>Due Diligence Period</u>
>
> (a) During the Due Diligence period, which is defined as sixty (60) days from the date of execution of this Agreement (the "Due Diligence Period"), [TWA] shall have the right to terminate this Agreement for any reason. . . .

*Id.* at 136a-37a. TSG retained the right to market Property during the Due Diligence Period, but had no right to terminate the Agreement of Sale. *Id.* The Agreement of Sale provided: "Legal title to the Property shall pass to [TWA] at Settlement." *Id.* at 132a.

Additionally, The Agreement of Sale identified two brokers, Hart and Gelcor Realty, whose commissions TSG was solely responsible for paying at the time of settlement. *Id.* at 139a. Binswanger was not identified as a broker. *Id.*

On January 7, 2014, Binswanger requested that TSG pay Binswanger a commission for the sale to TWA. *Id.* at 432a, 437a-38a. On January 16, 2014, and February 14, 2014, TSG sent letters of intent to terminate the contract with Binswanger effective March 26, 2014. *Id.* at 440a. On April 24, 2014, TWA entered into a mortgage for $2,890,000.00. *Id.* at 443a, 469a. Closing took place on the same date, and TWA purchased the Property for $3,400,000.00. *Id.* at 444a. TSG refused to pay Binswanger a commission.

On February 10, 2015, Binswanger filed a one-count complaint against TSG seeking a declaratory judgment that it was entitled to the five percent commission stipulated in the agreement, or $170,000.00. *Id.* at 21a-33a. In response, TSG filed an answer with new matter and twelve counterclaims. *Id.* at 34a-78a. On July 15, 2014, the trial court sustained Binswanger's preliminary objections to counts III through XII of TSG's counterclaims and dismissed them for failure to state a cause of action. *Id.* at 216a-17a.

Pursuant to a stipulation between the parties, Binswanger filed an amended complaint that added new counts II and III for breach of contract and breach of good faith and fair dealing, respectively. *Id.* at 219a-300a. TSG filed an answer to the amended complaint with new matter and the two counterclaims not previously dismissed by the court. *Id.* at 301a-326a.

Binswanger moved for summary judgment on all counts of its amended complaint. Citing *Dubin Paper Co., v. Ins. Co. of North America*, 63 A.2d 85, Binswanger argued that "Pennsylvania law is clear that a 'sale' of real property is not complete until legal title transfers to the buyer." *Id.* at 376a. Binswanger asserted that the Agreement of Sale "placed multiple conditions on [TSG and TWA] that could have prevented Settlement[,]" including the Due Diligence Period. *Id.* at 372a. Binswanger emphasized that legal title would not pass until settlement and that several other conditions were not in place at the time the Agreement of Sale was executed. *Id.* at 372a-73a. With respect to TSG's termination notices, Binswanger asserted it was entitled to remain as the exclusive agent for the Property until April 27, 2014, *i.e.*, six months and thirty days after the execution of the Brokerage Agreement.

TSG filed a cross-motion for summary judgment arguing that Binswanger had no right to a commission. TSG contended that under the doctrine of equitable conversion, title passed to TWA on January 3, 2014, the date of the agreement of sale. Thus, TSG concluded, Binswanger could not obtain a commission because the sale to TWA was complete before the end of

the Carve Out Period. Binswanger countered that it was due a commission because the sale was not complete until April 24, 2014, the date legal title passed to TWA at settlement, over three months past the carve out period. *Id.* at 348-78a (cross-motions for summary judgment).

On June 11, 2015, the trial court docketed the following order:

> It hereby is ORDERED that the parties' respective motions for summary judgment are granted in part and denied in part as follows:
>
> 1. [Binswanger's] Motion for Summary Judgment is granted in part and [Binswanger] is entitled to a commission per the Exclusive Listing Agreement;
>
> 2. [TSG's] Motion for Summary Judgment is granted in part and [Binswanger] is only entitled to collect one third of the commission, $56,666.67.
>
> All other aspects of the motions are denied.

Order, 6/11/15.

On July 8, 2015, TSG filed a notice of appeal from the June 11, 2015 order.[3] On July 22, 2015, Binswanger filed a cross-appeal. All parties and the trial court complied with Pa.R.A.P. 1925.

---

[3] In an opinion accompanying its summary judgment order, the trial court stated: "As for [Binswanger's] remaining claim[] of the breach of the duty of good faith and fair dealing, it is unnecessary to address [this claim] since it was pled as an alternative cause of action to the claims for declaratory judgment and breach of contract." Trial Ct. Op., 6/11/15, at 7 n.8. This comment left uncertain whether the trial court failed to decide the good faith claim and thus failed to enter a final order.

On May 11, 2017, we ordered the trial court to submit a supplemental opinion clarifying whether its order disposed of Binswanger's good faith claim. On

We address TSG's appeal at 2524 EDA 2015 first. TSG presents the following issues for review:

> 1. With respect to the Summary Judgment Order and related Opinion[:]
>
> a. Did the [t]rial [c]ourt err in holding that the doctrine of equitable conversion—the more than century old legal maxim that a sale of real property occurs when an agreement of sale is reached and not when legal title passes at a closing—does not apply to contracts between land owners and real estate brokers?
>
> b. Did the [t]rial [c]ourt err in ruling that the date Pennsylvania law deems real property to be sold differs depending on the type of person seeking that determination?
>
> c. Did the [t]rial [c]ourt err in holding that the doctrine of equitable conversion does not apply where an agreement of sale of Pennsylvania real estate that is irrevocable to the seller contains contingencies that are beyond the control of the seller and that are common to all real estate transactions, which holding effectively abolishes the doctrine?
>
> d. Did the [t]rial [c]ourt err by failing to consider whether the January 3, 2014 real property sale transaction fell within the meaning of the parties' agreed term "sale, exchange, or other transfer" in their brokerage Agreement (as defined herein)?
>
> e. Did the [t]rial [c]ourt err in holding that TSG's termination of the Agreement was ineffective where TSG provided notice in accordance with the terms of the Agreement?

May 22, 2017, the trial court entered a supplemental opinion stating that its decision for Binswanger on its claim for breach of contract also functioned as a grant of summary judgment for Binswanger on the good faith claim. We agree that the trial court ruled in favor of Binswanger on the good faith claim without awarding additional relief. Accordingly, the trial court's order is final and appealable under Rule 341(b)(1).

f. Did the [t]rial [c]ourt below err by not holding that Binswanger waived its argument and/or should be estopped from arguing that TSG did not terminate the Agreement where Binswanger expressly acknowledged and acted in furtherance of such termination?

2. With respect to the Preliminary Objections Order:

a. Did the [t]rial [c]ourt below err in holding as a basis to dismiss TSG's counterclaims that TSG suffered no damages where the [t]rial [c]ourt—albeit incorrectly— determined and quantified the damages suffered by TSG?[4]

TSG's Brief at 4-5.

TSG, in its first four arguments, claims that Binswanger is not entitled to a commission, because under the doctrine of equitable conversion, the sale to TWA was complete before the conclusion of the carve out period on January 5, 2014. Citing **Bauer v. Hill**, 110 A. 346, 347 (Pa. 1920), TSG asserts that "Pennsylvania courts consider a sale of real property 'complete' at execution of the sale agreement, even though full payment, delivery of the deed, and possession is set for a future time." TSG's Brief at 24. TSG further argues the trial court erred in concluding that the principles of equitable conversion did not apply to affect Binswanger's interest, and that the Agreement of Sale was conditional based on the mortgage contingency clause. TSG concludes that these errors resulted in a misinterpretation of the Brokerage Agreement and a conflation of the terms "sale" and "transfer." No relief is due.

---

[4] TSG's brief does not contain an argument that the trial court erred in dismissing its counterclaim. Therefore, this issue has been abandoned.

Our standard of review is well settled:

> [o]ur review of the trial court's grant of summary judgment is plenary. Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We must view the record in the light most favorable to the opposing party and resolve all doubts as to the existence of a genuine issue of material fact in favor of the nonmoving party. We will reverse the trial court's grant of summary judgment only upon an abuse of discretion or error of law.

***412 North Front Street Assocs., LP v. Spector Gadon & Rosen, P.C.***,

151 A.3d 646, 660 (Pa. Super. 2016) (citation omitted).

Moreover,

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

***Ramalingam v. Keller Williams Realty Grp., Inc.***, 121 A.3d 1034, 1046

(Pa. Super. 2015) (citation and emphasis omitted).

As our Supreme Court has stated,

> Sale is a word of precise legal import, both at law and in equity. It means * * * a contract between parties, * * * to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold. Land may be sold by an article of agreement as well as by deed[.] In popular language property under contract of sale

- 11 -

> is often referred to as sold. Whenever an **unconditional** agreement has been made for the sale of land such as equity will specifically enforce, it may properly be referred to and treated as sold. Then the vendee becomes the equitable owner, and the vender holds the legal title as trustee.

**Bauer**, 110 A. at 347 (citations and quotation marks omitted).

> [W]hen an unconditional agreement for the sale of land is signed, the purchaser becomes the equitable or beneficial owner through the doctrine of equitable conversion. The vendor retains a mere security interest for the payment of the unpaid purchase price. The equitable owner bears the risk of loss for injury occurring to the property after execution of the agreement of sale before the settlement.

**Byrne v. Kanig**, 332 A.2d 472, 474 (Pa. Super. 1974) (citations omitted) (emphasis added).

Following our review, we agree that the Agreement of Sale was conditional. By its own terms, the Agreement of Sale identified two conditions precedent. The Due Diligence Period provided TWA with sixty days in which it could terminate the Agreement of Sale for any reason, after which TWA was required to pay an additional deposit of $150,000. Moreover, TWA was responsible for obtaining mortgage financing. With respect to TWA's mortgage obligations, the Agreement of Sale provided that TWA was required to exercise good faith in seeking financing. The failure to obtain a mortgage after exercising good faith would not constitute a default, and TWA would be entitled to a return of its initial deposit and any applicable additional deposit. Nevertheless, TWA's failure to fulfil these conditions would render the Agreement null and void.

TSG cites to *Filsam Corp. v. Dyer*, 422 F. Supp. 1126 (E.D. Pa. 1976), to support its contention that none of the conditions in the Agreement of Sale precluded the application of equitable conversion to find that the property was "sold" on January 3, 2014. In that case, the defendant was not a resident of Pennsylvania, but he entered into an agreement of sale to purchase real property in Pennsylvania. He was subsequently sued by the plaintiff for breaching the agreement of sale. The defendant sought to avoid personal jurisdiction under the Pennsylvania long-arm statute because he did not own real property in the Commonwealth, asserting, in relevant part, that the contract to purchase the real property was conditional upon the defendant making repairs and alterations.

The district court rejected that argument, and reasoned as follows:

> [I]t is our view that the existence of such conditions as are within the control of the parties to a contract cannot in itself render the doctrine of equitable conversion inapplicable.
>
> The requirement that the land sale contract be "unconditional" should only bar equitable conversion where the condition must be accomplished before the contract can become operative. *See* 3 American Law of Property s 11.24 (1952). In the case of *In re Governor Mifflin Joint School Authority*, 401 Pa. 387, 164 A.2d 221 (1960), for instance, equitable conversion was said not to have taken place where the land purchase agreement was conditioned upon the passage of certain zoning changes. The purchaser in Governor Mifflin argued that as equitable owner he should benefit from a condemnation of the property prior to the accomplishment of the zoning changes. The Pennsylvania Supreme Court disagreed. It seems clear to us from the Court's discussion that the impediment to equitable conversion was the possibility that no zoning change at all would come about, coupled with the realization that (even

if a court of equity were to assume that what the parties agreed to do would be done) the hoped-for zoning change was not within the control of the parties.

In the present case we find no condition which is beyond the control of the parties and we therefore believe that an operative contractual relation arose upon execution of the agreement for the sale of land. [The defendant's] equitable ownership thus accrued at that time. We also note that no one has raised, and we are unable to find, any condition precedent to the duty of [the plaintiff] which from the start might have precluded specific enforcement in favor of [the defendant] and hence have prevented [the defendant's] equitable ownership from arising. **See** Restatement of Contracts [§] 374(1)(1932).

**Filsam Corp. v. Dyer**, 422 F. Supp. 1126, 1133 (E.D. Pa. 1976).

It is well settled that "decisions of federal district courts are not binding on Pennsylvania courts," **Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.**, 7 A.3d 278, 284 n.7 (Pa. Super. 2010) (citation omitted), and our review reveals no Pennsylvania case holding that a condition to a mortgage must be beyond the control of the parties. In any event, we find **Filsam** distinguishable. The alleged conditions in **Filsam** were minor formalities that did not amount to a condition precedent to the parties to the parties' operative contractual relation. Here, TWA could unilaterally and arbitrarily terminate the contract. Therefore, although the exercise of that condition was in the control of TWA, satisfaction or waiver of the Due Diligence Period constituted a condition precedent to the contractual relations of the parties, as well as their duties and ability to seek specific performance of the Agreement of Sale. **Cf. Klingensmith v. Klingensmith**, 100 A.2d 76, 79 (Pa. 1953) (noting

"[o]bligations under a contract are to be mutual and not merely unilateral, and both sides must be provided with the weapon of legal redress in the event either defaults in his obligations"); *DiBennedetto v. Di Rocco*, 93 A.2d 474, 475 (Pa. 1953). Therefore, the Due Diligence Period and the attendant requirement for the payment of an Additional Deposit were conditions precedent to the enforceability of TWA's promise to purchase the Property and equitable ownership did not pass until the conditions were met or TWA expressly waived their rights under that provision. Accordingly, we discern no error in the trial court's determination that the Agreement of Sale was conditional, the sale did not occur at the time the Agreement of Sale was executed, and that the sale, therefore, did not occur during the Carve Out Period.

TSG next contends that the trial court erred in finding that it did not terminate the contract before Binswanger earned the commission. TSG asserts that it gave notice of its intent to terminate the agreement on January 16 and February 14, 2014 and that the Brokerage Agreement should be deemed terminated as of March 26, 2014, "well before the April 24, 2014 closing date" of the sale of the Property to TWA. TSG also argues that Binswanger waived any claim that the termination should be deemed effective as of April 26, 2014, after the sale.

The termination provision of the Brokerage Agreement provides that TSG had "the right to cancel this Agreement after six (6) months and with

thirty days prior notice." Binswanger urged, and the trial court agreed, that this provision precluded TSG from issuing a notice of intent to terminate the contract until March 27, 2014, after six months passed from the execution of the Agreement. *See* Trial Ct. Op., 9/1/15, at 12. However, the trial court also suggested that the Agreement of Sale was signed on January 3, 2015, before TSG's could terminate the Brokerage Agreement, and thus concluded that Binswanger's commission was owed notwithstanding TSG's attempted termination. *Id.* at 12 n.20.

Instantly, even if we were to agree with TSG that the trial court erred in concluding that TSG's notices of intent were premature, TSG has offered no argument to the trial court's alternative conclusion that the Binswanger's commission was deemed earned before March 27, 2014. Instead, TSG appears to assume that any commission earned for the sale to TWA required a completed sale. Although the Brokerage Agreement states that no commission would be earned if the sale was completed on or before January 5, 2014, TSG presents no arguments to support its contention that a completed sale was necessary to deem the commission earned. Accordingly, we decline to grant relief based on the TSG's exercise of its right to terminate after six months.

Therefore, finding no basis upon which to conclude that TSG's appeal merits relief, we affirm the trial court's order to the extent it held that a commission was due to Binswanger.

Binswanger raises the following issues in its appeal at 2372 EDA 2015:

1. Did trial court err by holding that Binswanger was required to split the commission due under the Exclusive Right to Sell or Lease Agreement with two other brokers, because the plain language of the Exclusive Broker Agreement entitles Binswanger to five percent (5%) commission on the sale of the [P]roperty, regardless of who procured the buyer?

2. Did the trial court err by holding, as a matter of law, that Binswanger was required to split the commission where evidence of industry custom and the parties' intent created genuine issues of material fact about whether the terms of the Exclusive Right to Sell or Lease Agreement require a split of the commission?

3. Did the trial court err by holding that Binswanger was required to split the commission where TSG did not plead a claim or defense for a split of the commission?

Binswanger's Brief at 2.

Turning to Binswanger's appeal, all of Binswanger's arguments contest the trial court's decision to limit its commission to $56,666.67. Binswanger insists that it was entitled to five percent of the sale price in agreement of sale, or $170,000.00. We disagree.

As stated above, the Brokerage Agreement between Binswanger and TSG provided that Binswanger was not an exclusive broker with respect to the Excluded Entities. Moreover, the Borkerage Agreement stated: "In the event a purchaser or tenant is procured by another broker other than [Binswanger], [Binswanger] agrees to split any sale or lease commission with the other broker." The agreement of sale identified two brokers, Hart and Gelcor Realty, but did not list Binswanger as a broker. The trial court correctly determined

that this plain language required Binswanger to split the commission with the other two brokers, thus limiting Binswanger's commission to one third of $170,000.00, or $56,666.67.

Not only is the trial court's conclusion correct as a matter of law, but Binswanger waived its objections on appeal by completely failing to address the trial court's reasoning. Not once in its briefing does Binswanger mention the fee splitting provision relied upon by the trial court, let alone attempt to explain why it does not apply. ***See Banfield v. Cortes***, 110 A.3d 155, 168 n.11 (Pa. 2015) (where appellate brief fails to develop issue in meaningful fashion capable of review, that claim is waived).

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/26/2017*