LIMBACH COMPANY, LLC and Limbach Company, LLC/Parker Associates, a joint venture, Appellants

v.

CITY OF PHILADELPHIA, Philadelphia Authority For Industrial Development and US Airways, Inc.

Commonwealth Court of Pennsylvania.

Argued Feb. 27, 2006.

Decided July 24, 2006.

Reargument/Reconsideration Denied En Banc Sept. 15, 2006.

Robert A. King, Pittsburgh, for appellants.

Michael S. Zicherman, River Edge, NJ, for appellee, City of Philadelphia.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and LEAVITT, Judge (P.).

OPINION BY Judge LEAVITT.

Limbach Company, LLC and Limbach Company, LLC/Parker Associates, a Joint Venture (collectively Limbach) appeal the decision of the Court of Common Pleas of Philadelphia County (trial court) dismissing Limbach's complaint for damages for work it performed, but was not paid for, at two new terminals at the Philadelphia International Airport. Limbach did this work under contract with U.S. Airways, which is beyond suit because of its bankruptcy. However, funding for Limbach's work came not from U.S. Airways but from the City of Philadelphia and the Philadelphia Authority for Industrial Development (Industrial Authority),[1] which issued bonds to cover the cost of the construction on the new terminals. Limbach filed a complaint to hold the City and the Industrial Authority liable for Limbach's unpaid invoices because they own the new improved terminals; Limbach's work on the terminals was done under their direction and with their approval; and they provided the funds used to pay Limbach and other construction contractors. Indeed,

Limbach argues that since U.S. Airways had no obligation to repay the City and the Industrial Authority for the financing, U.S. Airways acted as a "straw man" for the City and the Industrial Authority in the new terminal project.

The trial court, in several orders, disposed of Limbach's complaint. It concluded that the evidence did not demonstrate that the City and the Industrial Authority had been unjustly enriched and that the facts, as pled in Limbach's complaint, were inadequate to support Limbach's alternative theory that it was a third party beneficiary of certain contractual arrangements between the City and Industrial Authority that established the funding for construction of the terminals. In this appeal, we consider whether the trial court erred.

## BACKGROUND

The City owns the land on which the Philadelphia International Airport is located, and it administers the operation of the airport through the Division of Aviation of the City's Department of Commerce. Increased domestic and international air traffic led to a plan for a new regional terminal (Terminal F) and a new international terminal (Terminal One). Pursuant to a Ground and Improvement Lease (Ground Lease), the City leased the land on which the two new terminals were to be built to the Industrial Authority; the City also granted the Industrial Authority the right to undertake the construction of the two new terminals (Project). In turn, the Industrial Authority entered into a Development Lease with U.S. Airways. Reproduced Record at 32a–202a (R.R. ——). Pursuant to the terms of the Development

1. The Industrial Authority is a corporation organized and existing under the law of the Commonwealth of Pennsylvania, having been created by the City pursuant to the Economic

Development Financing Law, Act of Aug. 23, 1967, P.L. 251, *as amended*, 73 P.S. §§ 371–386.

Lease, the Industrial Authority is the owner of the Project, while under the Ground Lease the City retains a right of reversion in and to the physical structures. Once the Project was completed, the Industrial Authority held title and leased the new terminals back to the City, which the City in turn subleased to U.S. Airways and other airlines.

Under the Development Lease, U.S. Airways was authorized to "design and construct, or cause to be designed and constructed, each and every of the Project Elements." Development Lease, Article 4.2; R.R. 60a. However, the Industrial Authority and the City retained the right to control the design of the Project and its construction. For example, the Industrial Authority had a right to review and approve all schematic designs, design-development and construction-bid documents, as well as any other design or construction change orders, before any construction could be implemented by U.S. Airways. Development Lease, Article 4.21(C)(1); R.R. 67a. Similarly, the Development Lease provided that the "City, in its sole discretion, may reject any designs so submitted and require U.S. Airways to resubmit designs and layout proposals until they meet City's requirements and are approved by City." Development Lease, Article 4.22(B)(1); R.R. 69a–70a.

In addition, the City and the Industrial Authority entered into an Inter-governmental Agreement by which the City provided "administrative support" to the Industrial Authority on the Project; assumed certain of the Industrial Authority's "administrative responsibilities;" and assumed "certain risks and responsibilities" associated with the Industrial Authority's performance under the Development Lease. R.R.1950a–1951a.

The Industrial Authority financed the construction of the new terminals with two bond issuances: the first bond was in the amount of $443,700,000 and the second in the amount of $187,680,000. The City issued the Industrial Authority a General Airport Revenue Bond (GARB) in an amount equal to the bonds issued by the Industrial Authority. The City used the fees it received under its subleases with the airlines to make its GARB payments to the Industrial Authority; in turn, the Industrial Authority used the City's GARB payments to finance the debt service on its bonds. The Industrial Authority bond funds (Bond Funds) were held by a trustee[2] and used to compensate the construction contractors for their work on the new terminals.

On October 26, 1999, U.S. Airways contracted with Williard, Inc. to do the electrical work at the new terminals and with Williard, Inc./Parker Associates, a joint venture, to do the HVAC/mechanical work. The two contracts are identical in all material aspects, except for the description of the work to be done. Relevant here is the contract term stating that U.S. Airways "shall pay or *cause the [trustee of the Bonds Funds] to pay* the amount otherwise due on any payment application." Williard Contract, Article 15.2.1; R.R. 1030a (emphasis added). Subsequently, Limbach replaced Williard, Inc. as successor corporation.[3]

From 1999 to 2002, the contracts between Limbach and U.S. Airways operated as contemplated. As Limbach completed work, it invoiced U.S. Airways. Where

---

**2.** The trustee named was First Union National Bank, now Wachovia Bank.

**3.** Limbach also holds Williard, Inc.'s interests in Williard, Inc./Parker Associates, a joint venture, and all references to Limbach/Parker venture include Williard, Inc./Parker.

invoices were approved by the Industrial Authority, U.S. Airways directed the trustee to pay the Limbach invoices, and the trustee did so by tapping the Bond Funds.[4] However, on May 29, 2002, U.S. Airways notified Limbach that it was terminating the contracts for convenience.[5] In response, on July 10, 2002, Limbach filed an assumpsit action in the Court of Common Pleas of Allegheny County against U.S. Airways, seeking $8,865,747 for electrical work and $5,915,912 for HVAC work done before the contracts were terminated. On August 11, 2002, U.S. Airways filed for protection under Chapter 11 of the United States Bankruptcy Code. Limbach then filed proofs of claim in the bankruptcy action to recover the amounts owing under the contracts. On June 7, 2004, Limbach received $1,543,468 for electrical work and Limbach/Parker received $999,375 for the HVAC work on the claims it filed in the bankruptcy proceeding.

On March 19, 2003, Limbach filed the action we consider here against the City, the Industrial Authority, and U.S. Airways, seeking damages for the work that was done, but not paid for, under two alternative legal theories in eight separate counts. The complaint named only the City and the Industrial Authority as defendants; however, the complaint also stated that, "US Air has been named as a party to this Action as it is a party to the Development Lease in accordance with the Stipulation and Order granting relief from the automatic stay entered February 21, 2003 in the United States Bankruptcy Court for the Eastern District of Virginia." R.R. 10a.

US Airways, the City and the Industrial Authority filed preliminary objections in the nature of a demurrer seeking dismissal of the complaint. On December 17, 2003, the trial court issued an order sustaining U.S. Airways' preliminary objections and dismissing U.S. Airways as a party. This order was not appealed. On December 18, 2003, the trial court addressed the preliminary objections of the City and of the Industrial Authority. The trial court sustained the preliminary objections with respect to Limbach's third party beneficiary claim, concluding that the complaint did not allege facts sufficient to show that the parties intended for Limbach to be a third party beneficiary of the Development Lease. However, the trial court overruled the remaining preliminary objections and called for the case to proceed on the remaining counts.

---

**4.** In her executive summary for the Philadelphia City Council, dated May 26, 1998, City Solicitor Stephanie L. Franklin–Suber described the payment arrangement as follows:

> The possible bankruptcy of U.S. Airways would cause some delay in the Project. However, there should not be any loss in Project funds for Project purposes since *the source of funds for the Project are the proceeds of the [Authority] revenue bonds.* Costs within the approved project cost estimate, costs approved by change order, and other additional costs are to be paid from the proceeds of the [Authority] bonds. Costs in excess of the approved project estimate caused by the negligent or imprudent management of U.S. Airways are the responsibility of U.S. Airways.

As discussed in more detail below, *the proceeds of the [Authority] revenue bonds will be deposited with a trustee and not U.S. Airways. The trustee will pay contractors directly and payments to contractors under the Development Lease are reimbursement for work performed* rather than payments in advance. To the extent that the contractors have performed or continue to perform for the benefit of [the Authority], the contractors would be entitled to be paid from the proceeds of the [Authority] bonds. R.R. 1630a (emphasis added).

**5.** Under the Contracts, U.S. Airways had the right to order Limbach to stop the work and follow instructions from U.S. Airways on shutdown. R.R. 208a.

In response, Limbach filed a motion for reconsideration. At the same time, the City and the Industrial Authority filed a motion for summary judgment on Limbach's remaining unjust enrichment claims. In an order and opinion dated June 29, 2005, the trial court denied Limbach's motion for reconsideration and granted the City and the Industrial Authority's motion for summary judgment, thereby disposing of the remaining counts of the complaint.

Limbach now appeals to this Court, raising two issues for our consideration.[6] First, Limbach argues that the trial court erred in sustaining the preliminary objections to Counts I and II of its complaint because the facts as alleged present a legally cognizable claim that Limbach was an intended third party beneficiary of the Development Lease. Second, Limbach contends that the trial court erred in granting summary judgment to the City and the Industrial Authority on its quantum meruit and constructive trust claims (Counts III—VIII) because there are material facts in dispute as to whether the City and the Industrial Authority have been unjustly enriched.

We consider, first, our scope and standard of review. Our scope of review is plenary over orders sustaining preliminary objections and granting summary judgment. *O'Donoghue v. Laurel Savings Association*, 556 Pa. 349, 354, 728 A.2d 914, 916 (1999). The standard of review is different, however, for each of the two orders appealed.

In considering the trial court's grant of a demurrer, we accept as true all well-pleaded allegations of material fact and all inferences reasonably deducible therefrom. *Stone and Edwards Insurance Agency, Inc. v. Department of Insurance*, 151 Pa. Cmwlth. 266, 616 A.2d 1060, 1063 (1992). A demurrer is appropriate where it is clear that the plaintiff cannot sustain a cause of action considering all the facts as pled. *Firing v. Kephart*, 466 Pa. 560, 563, 564, 353 A.2d 833, 835 (1976). When reviewing a grant of demurrer, we are bound neither by the inferences drawn by the trial court nor by its conclusions of law. *Cardenas v. Schober*, 783 A.2d 317, 321 (Pa.Super.2001). The court must resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. *Id.* at 321–322. Where any doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. *Scarpitti v. Weborg*, 530 Pa. 366, 369, 609 A.2d 147, 148–149 (1992).

With respect to summary judgment, the trial court will be reversed where it has erred as a matter of law. *Dunkle v. Middleburg Municipal Authority*, 842 A.2d 477, 480 n. 6 (Pa.Cmwlth.2004). Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. PA. R.C.P. No. 1035.2.[7]

---

**6.** We have reordered the issues for purposes of our analysis.

**7.** It states:

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party

The record must be viewed in the light most favorable to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Dunkle*, 842 A.2d at 480, n. 6. Summary judgment is proper only when the facts are so clear that reasonable minds cannot differ. *Harahan v. AC & S, Inc.*, 816 A.2d 296, 298 (Pa.Super.2003).

With these standards in mind, we proceed to the issues at hand.

## THIRD PARTY BENEFICIARY CLAIM

 In considering whether Limbach has set forth a cognizable claim as a third party beneficiary of the Development Lease between the Industrial Authority and U.S. Airways, we turn to the law on third party beneficiaries. In *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992), our Supreme Court set forth a history of the development of third party beneficiary law in Pennsylvania. Traditionally, in order for a third party to have standing to recover on a contract, both contracting parties must have expressed the intention in the contract to create a third party beneficiary. *Id.* at 370, 609 A.2d at 149 (citing *Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 70 A.2d 828 (1950)). In 1983, our Supreme Court carved out an exception to this strict rule in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983) by adopting Section 302 of the Restatement (Second) of Contracts.

 Under the Restatement, a third party can claim rights under a contract, even if not stated expressly, if it is consonant with the intention of the contracting parties. Section 302 states as follows:

who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense

Intended and Incidental Beneficiaries

(1) *Unless otherwise agreed between promisor and promisee,* a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the *circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.*

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1979) (emphasis added). Of course, as noted in the introductory language in Section 302, contracting parties may always state that their contract is not intended to create a benefit for third parties. The *Scarpitti* court expressed the principles of Section 302 in this way:

[A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself . . . *unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties,* and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. . . .

which in a jury trial would require the issues to be submitted to a jury.
Pa. R.C.P. No. 1035.2.

*Scarpitti,* 530 Pa. at 372–373, 609 A.2d at 150–151 (emphasis added) (citations omitted).

Although Limbach appended a copy of the Development Lease to the complaint, its claim of third party beneficiary status is not premised upon the actual terms of the agreement or any *express* intention of the Industrial Authority and U.S. Airways to make Limbach a third party beneficiary. The actual terms of the Development Lease are, therefore, not dispositive.[8] Limbach's theory tracks the Restatement analysis adopted by our Supreme Court in *Guy* and *Scarpitti,* which recognizes third party beneficiary status when the "circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302 (1979). Under the applicable standard for reviewing the grant of a demurrer, we conclude that Limbach has pleaded a legally cognizable claim that it was an intended third party beneficiary of the Development Lease.

In its complaint, Limbach avers that "[i]n recognition of its obligations under the Development [Lease], [the Industrial Authority] made progress payments directly to contractors performing work on the Project, including Williard and Williard/Parker, both before and after U.S. Air filed for bankruptcy." Complaint ¶ 54. Limbach further avers that U.S. Airways was required to post security to cover claims made by contractors against the City and/or the Industrial Authority.

Complaint ¶¶ 55–56. These allegations, if true, evince an intent of the parties to the Development Lease to benefit U.S. Airways' contractors, including Limbach's predecessors in interest. The parties to the Development Lease could have "otherwise agreed" to foreclose Limbach, or any construction contractor, from asserting the rights of a third party beneficiary. They did not. In short, Limbach has asserted a cognizable claim that the Industrial Authority and U.S. Airways, by establishing a vehicle for the payment of contractors, intended to benefit the contractors even though they were not individually named in the Development Lease.[9]

## QUANTUM MERUIT/UNJUST ENRICHMENT

■ In Counts III through VI of its complaint, Limbach asserted an alternative theory that the City and Industrial Authority were unjustly enriched by the work Limbach performed at the new terminals but for which it was never paid. Relying on the doctrine of quantum meruit, Limbach sought damages for the reasonable value of the work performed. Limbach's proposed remedy in Counts VII and VIII of its complaint is for the court to impose a constructive trust upon the Bond Funds held by the Industrial Authority. Limbach argues that the trial court erred in granting summary judgment in favor of the City and Industrial Authority on the foregoing counts. We agree.

---

8. The only express terms of the Development Lease concerning third party beneficiary rights are contained in Article 23.19. Specifically, Article 23.19(B) states that the City is a third party beneficiary of certain enumerated provisions of the Development Lease, and shall have the right to enforce the obligations of U.S. Airways in those provisions without having to proceed against the Industrial Authority. R.R. 128a. Notably, Article 23.19 does not indicate that the City is the *only* potential third party beneficiary, or that the parties intended to prohibit any other entity, such as a construction contractor, from claiming third party beneficiary status.

9. Indeed, they could not be individually named because the execution of the Development Lease preceded the choice of the construction contractors.

■ The equitable doctrine of quantum meruit involves a class of obligations imposed by law, regardless of the intention or assent of the parties, for reasons dictated by justice. The doctrine is based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby. *Department of Environmental Resources v. Winn*, 597 A.2d 281, 284, n. 3 (1991). To avoid such unjust enrichment, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract between the parties. *Id.* In short, the doctrine of quantum meruit describes the extent of liability on a contract implied-in-law, or quasi-contract, for the labor and materials provided. *Id.*

■ The *sine qua non* of a claim in quantum meruit is unjust enrichment. *Id.* at 284. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. *Schenck v. K.E. David, Ltd.*, 446 Pa.Super. 94, 666 A.2d 327, 328–329 (1995). The elements necessary to prove unjust enrichment have been described as follows:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. (citations omitted). The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Mitchell v. Moore*, 729 A.2d 1200, 1203–1204 (Pa.Super.1999). *See also Torchia v. Torchia*, 346 Pa.Super. 229, 499 A.2d 581, 582 (1985) ("[t]o sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.' ").

Two decisions by the Pennsylvania Supreme Court are instructive on the application of the doctrine of quantum merit to this case, and because the parties disagree as to the application of those cases, further discussion of each case is warranted. In *Meehan v. Cheltenham Township*, 410 Pa. 446, 189 A.2d 593 (1963), a developer subcontracted with another to install streets and sewers in his development but became insolvent before he paid the subcontractor. The sewers and streets were subsequently dedicated to the township, and after the subcontractor failed to establish a mechanics' lien on the improvements, he sued the township on a theory of unjust enrichment, seeking more than $17,000, or the value of his materials and labor.

In denying the subcontractor's claim, the Supreme Court first noted that it was unclear whether the act of dedication resulted in a financial benefit to the township since the cost of maintaining and repairing the improvements might offset any revenues generated. *Meehan*, 410 Pa. at 450, 189 A.2d at 595. The Court continued that even if the enrichment of the Township had been established, there would be no recovery since "the mere fact that one party benefits from the act of another is not of itself sufficient to justify restitution. There must also be an injustice in permitting the benefit to be retained without compensation." *Id.* at 450, 189 A.2d at 596. In determining whether the alleged enrichment would have been "unjust," the Court adopted Section 110 of the Restatement of Restitution, which deals with the situation where a third party benefits from

a contract entered into between two other parties. It provides as follows:

> [I]n the absence of some misleading by the third party, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third party.

*Id.* at 451, 189 A.2d at 596.

Applying the foregoing principles to the facts in *Meehan*, the Court noted that the subcontractor, in contracting to perform the services in question, had relied solely on the financial credit of the insolvent developer. The township had in no way induced the subcontractor to enter into the relationship and, therefore, the subcontractor could not "shift the loss resulting from its error in judgment to one who may have been indirectly benefited by the performance of these services." *Id.*

The second Supreme Court decision relevant to our inquiry is *D.A. Hill Co. v. CleveTrust Realty Investors*, 524 Pa. 425, 573 A.2d 1005 (1990). In that case, Cleve-Trust entered into a construction loan agreement with a developer for the construction of a shopping mall. The loan was secured by a mortgage in which CleveTrust held the first lien on the property. The developer contracted with a general construction contractor that hired subcontractors who were unknown to CleveTrust. The payment process involved the subcontractors' submission of invoices to the general contractor, approval of the invoices by an architect employed by CleveTrust, submission to the developer, and then submission to CleveTrust. CleveTrust then wired the requested amount to a title company, which would verify CleveTrust's primary lien and then disburse funds to the developer. The developer then paid the general contractor, which in turn paid the subcontractors.

The developer defaulted on the loan and, in accordance with its rights under the loan agreement, CleveTrust refused to disburse any additional funds. CleveTrust eventually foreclosed on the mall and purchased it at sheriff's sale for taxes and costs in the amount of $120,921. D.A. Hill, one of the subcontractors who had performed work on the mall, filed a complaint in equity against CleveTrust alleging that CleveTrust had been unjustly enriched. The trial court ultimately determined that CleveTrust had been unjustly enriched by the amount of retainage (10 of the amount invoiced and held back by CleveTrust) where the advances made were not in excess of the amount claimed by certain subcontractors. The Superior Court affirmed, and CleveTrust petitioned for allowance of appeal, arguing that the lower courts had erroneously determined that it was unjustly enriched by its foreclosure on the mall. The Supreme Court agreed.

The Supreme Court, citing its earlier decision in *Meehan*, again turned to the Restatement of Restitution for guidance, noting that "in the absence of some misleading by the third party, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third party." *D.A. Hill*, 524 Pa. at 432, 573 A.2d at 1009. The Court continued:

> In sum, this Court has held that in a case where a subcontractor has provided services and chattels to an owner who had no direct contractual relationship to the subcontractor, (1) any benefit conferred must, for purposes of recovery on an unjust enrichment theory, be measured by the value of the benefit to the owner, not by the value of the invoice submitted by the subcontractor; and (2) *the owner's retention of the benefit without paying any compensation to the subcontractor would not be unjust if the owner did not contract directly with or mislead the subcontractor.*

*Id.* (emphasis added). The Supreme Court first concluded that CleveTrust was not enriched. More pertinent to our inquiry is the second part of the Court's analysis, in which it concluded that even if CleveTrust had been enriched it was not *unjustly* enriched. Crucial to the Court's conclusion was the lack of any evidence of record that "CleveTrust either requested anything from the subcontractors or misled anyone; in fact it did nothing more than exercise its rights under the construction loan agreement to discontinue construction installment payments and foreclose on the property." *Id.* at 434, 573 A.2d at 1010.[10]

From this foregoing authority, we see that a claim in quantum meruit for unjust enrichment is, by nature, fact-sensitive. *Mitchell,* 729 A.2d at 1203–1204. The polestar of the unjust enrichment inquiry is whether the defendant has been *unjustly* enriched; the intent of the parties is irrelevant. *Id.* at 1204. *Meehan* and *D.A. Hill* teach us that where a third party benefits from a contract entered into between two other parties, the third party's retention of the benefit without paying any compensation to the aggrieved contracting party will not be unjust if the party enjoying the benefit did not mislead the subcontractor. The facts in *D.A. Hill* dealt with a traditional construction contract where the property owner relies upon the general contractor to choose the subcontractors. The opinion notes the absence of a direct contract between the subcontractor and the property owner, but this will always be the case where the plaintiff seeks relief under a theory of *quantum meruit.* The real question is whether the property owner had direct dealings with the subcontractor, which caused the subcontractor to perform work.

To survive the motion for summary judgment, Limbach had to raise a genuine issue of material fact as to whether the City and/or the Industrial Authority benefited from Limbach's performance under its contract with U.S. Airways and, if so, whether retention of that benefit without compensating Limbach would be unjust. The second part of this analysis required Limbach to plead facts that, when viewed in the light most favorable to it as the non-moving party, demonstrated that the City or the Industrial Authority misled Limbach in some way. We disagree with the trial court's conclusion that Limbach failed to satisfy this threshold burden.

In its complaint, Limbach averred that the Industrial Authority, as the promisor under the contract with U.S. Airways, and the City, as the owner of a reversionary interest in the Project, received a benefit to the extent Limbach provided materials and performed services in connection with construction of the terminals. Limbach was never paid for its services and, according to Limbach, the Industrial Authority withheld $2.5 million in retainage. With respect to whether the City and Industrial Authority were *unjustly* enriched, Limbach contends that the City and Industrial Authority were intimately involved in the Project and effectively requested the work performed by Limbach. Limbach also contends that the City and Industrial Authority misled Limbach to believe that they would pay Limbach for its work.

Limbach offered sufficient evidence to raise a genuine issue of material fact concerning the above-mentioned contentions.

---

**10.** The *D.A. Hill* court also noted that the subcontractors, like Limbach, had voluntarily waived their rights to mechanics' liens and went forward without being protected by a performance bond. The Court characterized this decision as a calculated decision that carried a certain amount of risk, and that it would be "manifestly unfair" to restructure the contractual arrangement so as to shift the risk onto CleveTrust. *D.A. Hill,* 524 Pa. at 434, 573 A.2d at 1010.

According to Limbach, it was the City that actually controlled the construction and financing of the Project through the intricate contractual arrangements that effectively made U.S. Airways a straw party. For example, under the Development Lease, the Industrial Authority and the City retained the right to control the design and construction of the Project. The Industrial Authority had the right to review and approve all schematic designs, design-development and construction-bid documents, as well as any design or construction change orders, before U.S. Airways could implement any work on the Project. Development Lease, Article 4.21(C)(1); R.R. 67a. Similarly, the Development Lease provided that the City retained ultimate approval over any design or layout proposals submitted by U.S. Airways. Development Lease, Article 4.22(B)(1); R.R. 69a–70a.[11] The Development Lease was specifically referenced in the contracts between Limbach and U.S. Airways, thus creating a genuine issue of fact as to whether Limbach was aware of the extent to which the City and/or Industrial Authority actually controlled the Project.[12]

The financing scheme described in the pleadings creates similar issues for a fact-finder. The Development Lease established the system by which contractors were to receive payment from U.S. Airways for work performed on the Project. Limbach averred that it relied upon the Industrial Authority's municipally-backed funding when it contracted with U.S. Airways, an assertion borne out by Limbach's decision not to demand a performance bond from U.S. Airways and to waive its right to mechanics' liens. Limbach also averred that it was advised by agents of U.S. Airways that it would be paid out of the Bond Funds controlled by the Industrial Authority. Indeed, the Development Lease is explicitly referenced in the construction contract between Limbach and U.S. Airways. Limbach offered supporting evidence that every payment it received came directly from the Industrial Authority out of the Bond Funds, including payments made after U.S. Airways filed for bankruptcy protection.[13] The pleadings and supporting evidence, viewed in the light most favorable to Limbach, depict a financing scheme in which U.S.

**11.** In addition to these contract terms, Limbach provided testimonial evidence to prove the City's supervision of the terminal work. For example, Thomas Varughese, a project manager for the City, testified that the City's Division of Aviation had its own team intimately involved in the construction project, reviewing plans and specifications. R.R. 2031a–2035a.

**12.** Article 2 of the contract reads:

> **2.5 DEVELOPMENT LEASE** [US Airways] is authorized to enter into this agreement pursuant to a Development Lease (the Development Lease) between the Philadelphia Authority for Industrial Development (PAID) and [US Airways] dated July 1, 1998 governing certain improvements to the Philadelphia International Airport (the Airport). *References in the Contract Documents*

> *to [US Airways] intended to benefit or protect the owner of the site where the work is being performed shall be construed so as to mean U.S. Airways, Inc., the Philadelphia Authority for Industrial Development and the City of Philadelphia (City).*
>
> Williard Contract, Article 2.5; R.R. 1002a (emphasis added).

**13.** In a sworn affidavit, Ronald Zemnick, a senior vice president of the electrical division of Williard/Limbach, stated that every payment to Limbach received via check or wire transfer was from accounts identified as either "First Union National Bank Philadelphia Authority for Industrial Development Airport 1998 Construction Fund" or "Wachovia Bank, N.A., Philadelphia Authority for Industrial Development Airport 2001 Construction Fund." R.R. 1334a–1337a. *See also* Complaint ¶ 54.

Airways was little more than a conduit for payments issued by the Industrial Authority from the Bond Funds.[14]

## CONCLUSION

In sum, Limbach's complaint asserted a legally cognizable claim that it was a third party beneficiary to the Development Lease between the Industrial Authority and U.S. Airways. The trial court should have resolved any doubt in favor of over-ruling the demurrers to Counts I and II of the complaint. Likewise, the pleadings and submissions offered by Limbach raise genuine issues of material fact as to whether the City and Industrial Authority were unjustly enriched by the services Limbach provided in connection with the Project. The parties' briefs to this Court offer divergent views of the role of the City and Industrial Authority based on diametrically opposed interpretations of the contracts and statements by various witnesses. Because the facts underlying Limbach's unjust enrichment claim are so hotly contested, the need for review by a fact-finder is eminently clear. Accordingly, we find that the trial court erred by granting summary judgment on counts III through VIII of the complaint.

For the foregoing reasons, the orders of the trial court are reversed and the matter is remanded for further proceedings. Jurisdiction is relinquished.

## ORDER

AND NOW, this 24th day of July, 2006, the orders of the Court of Common Pleas of Philadelphia County, dated December 18, 2003, and June 29, 2005, in the above-captioned matter, are hereby RE-VERSED. The matter is remanded to the trial court for further proceedings. Jurisdiction relinquished.

---

**14.** We reject the argument of the City and Industrial Authority that *D.A. Hill* is so factually similar to the present case that Limbach is precluded as a matter of law from pursuing its unjust enrichment claim. The crux of the City and Industrial Authority's argument is that they acted in the same financing capacity as CleveTrust, and had the same minimal level of control over the Project. The City and Industrial Authority also fear that an "expanded" view of *D.A. Hill* will render every owner, lender and construction manager "who provided some direction or answered a question related to a project" a guarantor of every general contractor. Appellees' Brief at 16–17. We disagree, first, with the claim that the City and Industrial Authority acted in the same financing capacity as CleveTrust. CleveTrust was a mortgage lender and primary lienholder. The City owns a reversionary interest in the Project, and the Industrial Authority cannot seriously argue that it was a mere lender inasmuch as U.S. Airways was under no contractual obligation to repay the Bond Funds. Second, the City and Industrial Authority's fears regarding the ramifications of a Limbach victory really beg the ultimate question in this case: did the City and Industrial Authority only "provide direction" on the Project? Or did they effectively exercise complete control? The very existence of these factual issues demonstrates why summary judgment was improper.