**First Surety Financial LLC v. Taylor Associates LP**

*Jonathan A. Cass* and *Daniel E. Fierstein*, for plaintiff.

*Stephen T. Carpenito* and *Walter T. Grabewski*, for defendants.

SNITE, *J.*, July 18, 2014—

## FINDINGS OF FACT

### I. The Parties.

1. Plaintiff, First Surety Financial, LLC ("First Surety") is a private specialty lender that provides construction industry financing to contractors and subcontractors. Trial tr. vol. 1, p. 54:11-13 (Ronald Gregory LeFevre ("LeFevre")).[1]

2. Defendant Taylor Associates, LP ("Taylor Associates") is a limited partnership formed for the purpose of building a shopping center which would come to be known as Taylor Commons. Trial tr. vol. 5, p. 6:10-

---

1. Citations are to seven days of testimony: October 22, 23, 25, 26, November 6, 7, and 27, 2012. The November 27, 2012 transcript actually is misidentified as "January 27, 2012".

14 (Samuel Zamias ("S. Zamias").

3. Defendant Taylor Gen/Par, LLC is a limited liability company and the general partner of Taylor Associates. Trial tr. vol 5., p.7 16-18 (S. Zamias).

4. Defendant Zamias Services, Inc. ("Zamias") is an agent of Taylor Associates, and acted as the construction manager for Taylor Associates. As construction manager, Zamias was responsible for overall management, development, and leasing on behalf of Taylor Associates. Trial tr. vol. 2, pp. 34:23-35:1 (John Spory ("Spory")).

5. Zamias was also responsible for handling contractor payment requisitions (which included the provision of payment advice to Taylor Associates), payments to contractors, Project funding, and recommending the approval of change orders. Trial tr. vol. 5 at p. 26:7-25, 27:1-2, 28:6 -15, 30:10-23, 137:2-8, 192:1-7) (S. Zamias and Joseph Anthony ("Anthony").

6. Additional defendant A.R. Popple, Inc. ("Popple") is the contractor hired by Taylor Associates to perform the site work on the Project. Trial tr. vol. 5, p.10:16-19 (Zamias); Trial tr. vol. 6 p.77:6-10 (Anthony).

7. Samuel Zamias, Stephen Zamias, George Zamias, and Damian Zamias are managing members of Taylor Gen/Par, LLC. (Trial tr. vol. 6 p. 60:4-61:3, 62:1-65:11 (Anthony). Managing Members have the ability to make decisions and bind the limited liability company. Defendants ex. 142; *Id.* 66:9-14 (Anthony).

## II. Background.

8. Between 2007 and June 5, 2009, First Surety provided construction financing to Popple for a project known as Taylor Commons. Trial tr. vol. 1, p. 57 3-9, 58:2-25, vol.2. pp.191:1-7, 229:17-23 (LeFevre), plaintiff's ex. 4.

9. Taylor Commons was to be a shopping center anchored by a Wal-Mart. Taylor Associates sold approximately half of the property to Wal-Mart, then entered into a development agreement with Wal-Mart to develop the Taylor Commons site, as well as an adjacent site on which Wal-Mart would construct its store (collectively, the two parcels shall be referred to as the "Site"). Specifically, the development agreement provided that Taylor Associates would contract for and oversee the preliminary site work for the entire Site, including the pad where the Wal-Mart would be built, and Taylor Associates and Wal-Mart would split the costs. Trial tr. vol. 5 p.8:3-10:25 (S. Zamias), plaintiff's ex. 2 at ex. C.

10. In October 2007, Popple entered into a construction contract (the "Construction Contract") with Taylor Associates. Popple agreed to perform site improvement work for the project that included excavation, grading, and the installation of sanitary sewer systems and other piping and utility work in exchange for a lump sum price of $6,388,721. Trial tr. vol.1, pp.59:8-25, 60:1-14 (LeFevre); *see also* trial tr. vol.5, pp. 37:24-25; 38:1-25 (S.Zamias); *see also* plaintiff's ex. 2.

11. In order to begin work on the project, Popple entered into an agreement with First Surety, under which First Surety provided short-term financing to Popple for the project. Trial tr. vol. 3, p 148: 5-12 (A.R. Popple).

12. In October 2007, First Surety and Popple entered into a loan agreement, under which First Surety initially authorized Popple to borrow up to $750,000. Plaintiff's ex. 4.

13. Popple also executed a note and a security agreement to secure its obligations under the loan agreement. Plaintiff's ex. 5 and 6. Under the note, First Surety could increase the amount and term of the loan to protect the security set forth in the security agreement. Trial tr. vol. 1. p.64:7-20, p.72:1-4 (LeFevre); plaintiff's ex. 6.

14. The loan functioned as a line of credit. Trial tr. vol. 1 pp. 64:23-25, 65:1-2, vol.2. pp. 252:21-25, 253:1-8 (LeFevre); plaintiff's ex. 6.

15. The original $750,000 loan threshold was increased to $1.1 million in April 2008, to $1.85 million in August 2008, and to $2.1 million in September, 2008. Trial Tr. Vol 1. pp. 73:21-25, 74:1-10, 75:18-25, 76:1-2, trial tr. vol 2. p. 157 (LeFevre); plaintiff's ex. 12.

16. To obtain funding from First Surety, Popple would make written requests for funds as needed, accompanied by backup information to support each request. Trial tr. vol. 1, p. 87:2-10 (LeFevre).

17. The note required that all payments due under the Construction Contract from Taylor Associates to Popple be made directly to First Surety. Plaintiff's ex. 6.

18. Accordingly, on or about October 12, 2007, First Surety, Popple, and Taylor Associates executed an assignment agreement (the "assignment agreement"). Trial tr. vol. 5 pp. 41:8-25, 42:1-6, 43: 4-9 (S. Zamias);

plaintiff's ex. 10-11.

19. The assignment agreement provides that, subject to certain conditions, payments under the construction contract were to be made to First Surety:

(1) *Assignment* — [Popple] assigns, transfers, sells and conveys to [First Surety] all of its entire right, title and interest in and to payments due under the construction contract including, the right to receive payment directly from [Taylor Associates], provided [Popple] is not then in default under said contract or has otherwise committed acts or omitted obligations that give rise to suspension or termination of payments from [Taylor Associates]. In such event, this assignment shall no longer be binding on [Taylor Associates].

(2) *Payment* — Until and unless the Loan is paid in full, [Taylor Associates] shall deliver to [First Surety][2] any and all monies due to or to become due to [Popple] under the construction contract. All such payments shall be sent by [Taylor Associates] to [First Surety] at its offices located at the address stated above and shall be addressed to the attention of R. Gregory LeFevre. Under no circumstances is said payments to be deposited/negotiated by [Popple] without written authorization from [First Surety]. Trial tr. vol. 5 p. 43:4-9 (S. Zamias); plaintiff's ex.10-11.

20. The manner in which this three-party relationship

---

2. The agreement actually states that delivery be to "Assignor" who is Popple. This is a typographical error, as the agreement would be meaningless if the "Assignor" was going to get the money it was assigning.

operated was that First Surety would, at the written request of Popple and after review, disburse cash advances to Popple to be used to pay costs associated with the project under the construction contract, and as Popple performed the work, Popple would submit applications for payment to Taylor Associates. Trial tr. vol. 1, pp. 87:2-10, 88:22-25, 89:1-25, 95:4-14 (LeFevre).

21. The proceeds generated from Popple's applications for payment, which Taylor Associates funded, were to be paid to First Surety. Trial tr. vol. 1 at p. 95:4-14 (LeFevre); trial tr. vol. 5, p. 43:4-9 (S. Zamias).[3]

22. Sometime in the Spring of 2008, it was discovered that there existed a huge "mine void" which existed underground where the parking lot was to be located. This caused a dangerously unstable area of land that could collapse. This became the subject matter of change order 2, referred to as "mine void remediation." Trial tr. vol. 2, p. 159 (LeFevre).

23. On or about November 5, 2008, a meeting was held at Zamias' office in Johnston Pa., at which Zamias, under the authority and direction of Taylor Associates, issued a $175,000 check payable to Popple. Trial tr. vol 5, pp.133: 12-137:8 (Anthony). This check was to reimburse Popple and Popple's subcontractor(s) for work that had been completed as part of the significant change order for mine remediation. Trial tr. vol. 2, pp. 48:8-13, 49:24-25, 50:1-2 (Spory); trial tr. vol. 5, p. 139:14-18 (Anthony); trial tr.

---

3. The actual funding was coming from Wal-Mart and Taylor Associates' lender, Third Fifth Bank.

vol. 4, p. 69: 1-24 (Popple).[4] Two more checks, each for $12,500, dated December 12, 2008, brought the total to $200,000.

24. Between August 19, 2009 and April 2, 2010, Taylor Associates issued ten more payments directly to Popple in the total amount of $490,385.54, and fifteen more payments to either Popple and a subcontractor jointly, or directly to a Popple subcontractor, in the total amount of $682,394.33. pl. ex. 36 at tabs 2-28.

25. In total, Taylor Associates issued twenty-eight payments totaling $1,372,779.87 to parties other than First Surety (the "Misdirected Payments"). *Id.* at tabs 1-28; trial tr. vol. 1, p. 156:9-23 (LeFevre); trial tr. vol. 2, p. 81: 5-23 (Spory).

26. First Surety did not have specific knowledge of these Misdirected Payments. Trial tr. vol. 1., pp. 140:20-25, 141:1-5, 155:3-25, 156: 1-25, 157:1-5 (LeFevre).

27. First Surety did not necessarily suspect that Taylor Associates was issuing payments under the construction contract to other parties because, during the same time frame, First Surety continued to receive sporadic payments under the assignment agreement from Taylor Associates. Trial tr. vol.2, p.55:14-20 (Spory); trial tr. vol. 1 pp. 155:3-25, 156:1-25, 157:1-5 (LeFevre). The last payment was dated October 13, 2009. Vol. 2 19-23 (LeFevre).

28. Despite frequent communications between representatives of Zamias and First Surety, the only time

---

4. The work had been ongoing for a number of months before the applicable change order was actually executed.

when Zamias and/or Taylor Associates advised First Surety that Taylor Associates intended to make a direct payment to one of Popple's subcontractors took place during January 2009. Trial tr. vol. 1, pp. 124-133 (LeFevre), trial tr. vol 2, p. 68:8-15 (Spory); plaintiff's ex. 34.

29. At that time, a representative of Zamias, John Spory, advised First Surety that the subcontractor, Newport Aggregate, had threatened to file a mechanic's lien claim for the value of its unpaid work on the project. *Id.*

30. In that instance, First Surety was aware of and granted permission to Zamias, on behalf of Taylor Associates, to make the $35,380.01 payment to Newport Aggregate, and Taylor Associates issued the balance of the payment to First Surety. Trial tr. vol. 1, pp. 132:12-25, 133:1-20 (LeFevre), plaintiff's ex. 34.

31. Other than that payment, neither Zamias nor Taylor Associates ever notified First Surety that Taylor Associates was making payments to parties other than First Surety. Trial tr. vol.2, p. 68: 8-15 (Spory).

32. First Surety's loan to Popple was never paid in full; the principal owed at the end of 2009 was $788,548.79, plus interest and fees, to total $2,328,335.34. The parties stipulated to the accuracy of these numbers. Trial tr. vol. 2, pp. 9-16; plaintiff's ex. 47.

## CONCLUSIONS OF LAW

### I. Taylor Associates breached the Assignment Agreement by sending payments to Popple and/or its subcontractors rather than to First Surety.

33. To prevail on a claim for breach of contract, a plaintiff must prove "(1) the existence of a contract, (2) a breach of a duty imposed by that contract, and (3) damages." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A. 2d 710, 716 (Pa. Super. 2005) (internal citations omitted).

34. Taylor Associates was a signatory to a contract — the assignment agreement — between it, First Surety and Popple. This agreement, executed on October 12, 2007, was made for valuable consideration and with the intent to be legally binding. Plaintiff's ex. 10-11. The language of the assignment agreement obligates Taylor, as owner, to pay any monies that it owed to Popple under the construction contract, to First Surety.

35. The interest rate for the Loan First Surety made to Popple did not render it an illegal contract.

36. Although the rate of 6 percent per month was above the maximum rate of interest under the Usury Statute (41 P.S. §201), the statute provides an exception to this rule for business loans. *Id.* at (b)(3). It is undisputed that the loan in dispute was a business loan.

37. Accordingly, the loan is permitted by law and does not violate the Usury Statute or the RICO Statute (18 Pa. C.S. §911(h)(1)).

38. During the time in which the misdirected payments were made to Popple and subcontractors, Taylor Associates was also making payments to First Surety.

39. Taylor Associates' actions indicate that Taylor did not believe its obligations to First Surety were fulfilled.

40. This court ruled prior to trial that under the assignment agreement, any payments to be made by defendants for work under the Construction Contract were required to be made to First Surety, not to Popple. (Court's order of October 4, 2012).

41. Taylor would be excused from its obligations under the assignment only if Popple defaulted, and consequently Taylor was no longer obligated to make payments to Popple; or if Popple committed acts or failed to perform obligations such that payments to Popple could be suspended or terminated.

42. First Surety provided at trial a list of 28 payments that Taylor made under the project that were misdirected payments; i.e., paid to entities *other than* First Surety. Without directly showing the amount of money Taylor might actually owe under the Construction Contract, First Surety simply claimed this amount of money as the amount due it under the theory of the breached assignment.

43. These 28 payments were identified by First Surety from the discovery it obtained from Taylor.

44. Taylor presented testimony at trial, both from Zamias' John Anthony, and from Anthony Popple, that payments #23. through #28., although payable for the Taylor Commons construction project, were not actually due to be paid to Popple.

45. Payments #25., #26., and #27. were to a sub-contractor of Popple whom Popple should have already paid and who was threatening a mechanic's lien. Vol. 2 pp. 132-136 Spony, vol.4 pp. 158-159 (Popple). vol. 4 pp.

161 (Popple).

46. Payment #28. was to a subcontractor who was being paid "outside of" Popple's contract. Vol. 3 pp. 210-214 (Popple).[5]

47. Payments #23. and #24. were to a subcontractor (Susquehanna) of a subcontractor (Sheller); where it was shown that Sheller had been paid but had not paid Susquehanna. Vol. 4 pp. 160.

48. Payment #22. was paid by Taylor to Popple and a subcontractor who did not have a contract with Popple. Vol. 4, p. 161 (Popple). *See, also,* vol. 5, pp. 87-94 (Zamias), Vol. 6 pp. 154, 160-164 (Anthony).

49. The court holds that such payments did not have to be forwarded to First Surety. These payments were either outside of the Construction Contract, or represented what would be the equivalent of double payments for some costs.

50. Taylor likewise claimed similar circumstances with respect to other payments, but not to such a situation where it is excused from its assignment obligations.

51. Although Taylor took the position that payments #1., #2., and #3., totaling $200,000, were paid by Taylor through its own lender (Fifth Third Bank) to pay Popple sub-contractors who had not been paid for a period of months due to the extensive problems caused by the "mine void", Taylor did so at its own peril.

_____

5. There also was testimony from Anthony Popple that first surety contracted with and paid Krasavage for the "sanitary" drains, and Taylor paid Krasavage for the "storm" drains. Vol. 4 pp. 156-157.

52. The financing agreement in place had high interest rates, including a significant transaction fee for each advance. When the mine void was discovered, the impracticality and the ultimate outcome was nearly certain. Taylor's direct payment of $200,000 to Popple in December 2008 was a significant step in the divergence from the protocol set forth in the assignment agreement.

53. First Surety made its last advance in June, 2009. Trial tr. vol. 3, p. 83 (LeFevre). By early fall First Surety and Popple were negotiating terms of default. *Id.* at 94. By April, 2010, Popple was gone from the project. Trial tr. vol. 5, p. 73 (Zamias).

54. Taylor Associates is liable to First Surety for breach of the assignment agreement.[6]

## II. Zamias did not tortiously interfere with the Assignment Agreement.

55. The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual

---

6. Although Taylor Associates argued that it was paying Popple money so that Popple's demand on First Surety would be less, the argument misses the point that, as long as Popple was still on the construction site, and still periodically had a balance due to First Surety, it was Taylor Associates' obligation under the assignment agreement to pay the money to First Surety.

legal damage as a result of the defendant's conduct. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 2010 PA Super 175, 7 A.3d 278, 288-89 (Pa. Super. Ct. 2010).

56. As discussed *supra*, a valid contract existed between First Surety, Popple, and Taylor.

57. No evidence that Zamias acted with the specific intention of harming the relationship between First Surety and Taylor was presented.

58. The only testimony offered by Joseph Anthony, of Zamias, corroborated by Gregory LeFevre, of First Surety, was that the purpose of these payments made outside of the assignment agreement was to keep the Project moving forward. Trial tr. vol. 5 pp.194:25-195:6 (Anthony). This purpose does not encompass any malice or intent to harm First Surety.

59. Moreover, Zamias' conduct was privileged, due to Zamias' role as Taylor Associates' agent. "An agent cannot tortiously interfere with its principal's contract when acting within the scope of his agency." *Werther v. Rosen*, 1078 May Term 2002, 2003 WL 1861579 (Pa. Com. Pl. Apr. 2, 2003); *See also Rutherfoord v. Presbyterian-Univ. Hosp.*, 417 Pa. Super. 316, 332, 612 A.2d 500, 508 (1992) ("Where employees or agents for the corporation act within the scope of their employment or agency, the employees, the agents and the corporation are one and the same; there is no third party.")

60. As the construction manager for Taylor Associates, Zamias' duty was to advise Taylor Associates regarding all issues surrounding the Project's construction activities,

and how to respond to them. Any advice Zamias gave Taylor Associates regarding payment of contractors and subcontractors is well within the scope of its agency, and is therefore privileged.

61. Finally, it is clear from the evidence at trial that the decisions regarding payment were made by Taylor Associates, and that payments made by Zamias were made at Taylor Associates' direction. Trial tr. vol.5:50:14-51:14 (S. Zamias).

### III. First Surety is owed damages for Taylor Associate's Breach of Contract.

62. First Surety argues that the measure of its damages is the total of the misdirected payments.

63. First Surety has demonstrated that the misdirected payments totaled $1,372,779.87; the burden therefore shifted to Taylor Associates to rebut the adequacy of the damages evidence. *Penn Elec. Supply Co., Inc. v. Billows Elec. Supply Co., Inc.*, 364 Pa. Super. 544, 547, 528 A.2d 643, 644 (1987) ("once plaintiff establishes the measure of his damages, the burden of proof to rebut plaintiff's claim is on the defendant"). Defendant adequately demonstrated justification for payments #22. - #28., in the amount of $195,461.61, but did not otherwise rebut the remaining claims.[7]

---

7. Defendants' argument that some of the misdirected payments do not count as actual losses to First Surety, because First Surety would have been obliged to pay them out to Popple or to its subcontractors, is illogical. The payments were assigned to First Surety as consideration for the loans it made to Popple; the payments are to pay First Surety *back* for loans it already extended. Trial tr. vol. 2 p.227:7-15 (LeFevre). While First Surety may have made the decision to put the money back into the project, that was for First Surety to determine, not another party.

64. Under this analysis, First Surety would be awarded $ 1,177,318.28 in damages.

65. However, as previously noted, although this last figure analyzes what the damages would be by examining the propriety of the "misdirected payments," this does not finally settle the issue of actual damages.

66. There is absolutely no evidence in the record that Taylor would ever be liable for Popple's interest or transaction fees.

67. Consequently, actual damages suffered cannot rise above the actual and final principal owing.

68. First Surety stipulated that this amount was $788,548.79.[8]

69. Plaintiff First Surety is therefore awarded damages of $788,548.79, together with pre and post-judgment interest.[9]

---

8. Stated differently, assume that Taylor had, in fact, remitted the entire $1,372,779.87 to First Surety. First Surety would then have to remit all the funds in excess of $788,548.79, back to Taylor.

The court has undertaken this dual analysis in the event that its final award is disturbed either on post-trial motions or appeal.

9. The decision in this case is in no way meant to limit any damages Taylor Associates may seek from Popple in the bifurcated portion of this lawsuit.

Two more things should be noted. Taylor Associates is mistaken when it seems to argue that in a number of instances the provisions of the construction contract between Taylor and Popple trumps the assignment agreement. It is only logical that the reverse is true. Taylor is also without logical support to take the position that it can unilaterally decide that Popple has defaulted in the Construction Contract and then unilaterally decide that the assignment agreement is null and void, especially without informing First Surety of these decisions.